Filed 11/3/21  In re N.D. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.D., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077131 |
| Plaintiff and Respondent, | (Super.Ct.No. J281490) |
| v. | OPINION |
| G.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Jodi L. Doucette, Special Counsel, for Plaintiff and Respondent.

1

G.M. (mother) filed a petition under Welfare and Institutions Code section 388 (unlabeled statutory references are to this code) asking the juvenile court to order additional reunification services for her. The court denied the petition without holding an evidentiary hearing. The court then terminated parental rights, freeing mother's minor son, N.D., for adoption. (§ 366.26.) Mother appeals from the orders denying her section 388 petition and terminating her parental rights. We affirm.

BACKGROUND

In June 2019, San Bernardino County Children and Family Services (CFS) received a referral for general neglect and emotional abuse as to N.D., who was one month old, and his older half-sister M.B., who was four years old. Mother was being treated for injuries inflicted by N.D.'s father over the course of several days. A few days before the referral, N.D.'s father and mother were arguing, and he moved a car she was seated on, causing her to fall off. While at another hospital one day earlier, N.D.'s father "back handed" mother in the parking lot. Mother and N.D.'s father then went to a relative's house, where N.D.'s father slapped and punched mother and held her down. Mother lost consciousness. M.B. witnessed the attack. M.B. reported to a law enforcement officer that she had seen mother "get pinned down and hit."

Mother minimized the domestic violence when interviewed by the social worker. She claimed to have sustained all of her injuries in the fall from the car. She denied that N.D.'s father caused any of her injuries. The children were both temporarily detained. N.D. was placed with his paternal great-grandmother.

In October 2019, the juvenile court took jurisdiction over both children on the basis of sustained allegations of ongoing domestic violence between mother and N.D.'s presumed father, mother's failure to protect the children from that violence, and M.B.'s biological father's incarceration and inability to arrange appropriate care for his child. (§ 300, subds. (b), (g).) The jurisdiction/disposition report indicated that the violence in the home was often fueled by N.D.'s father's alcohol use.

The court removed the children from their parents' custody, ordered reunification services for mother and N.D.'s father, and bypassed services for M.B.'s father on the basis of section 361.5, subdivision (e). The case plans included domestic violence programs for mother and N.D.'s father and substance abuse treatment and testing for N.D.'s father. The court ordered monitored visits for mother and N.D.'s father but no visits for M.B.'s father, and mother and N.D.'s father were to visit separately. The fathers are not parties to this appeal.

At the six-month review hearing on May 08, 2020, CFS recommended that reunification services continue for mother and N.D.'s father. Mother had completed all court-ordered services, including eight sessions of individual counseling, 12 parenting classes, 12 anger management classes, and 12 hours of a domestic violence program. CFS reported that mother appeared to benefit from her participation in those services. Mother's individual therapist reported and CFS agreed that mother had "identified past patterns in her relationship which lead to [domestic violence] and ha[d] identified ways to better protect and parent her children." CFS's only concerns with returning the children

3

to mother were that she did not have stable employment and had not provided CFS an updated residential address.

CFS described N.D. as a "happy baby" who liked music and dancing and was thriving in paternal great-grandmother's care. N.D. was bonded to paternal great-grandmother.

The court followed CFS's recommendation and continued reunification services for mother and N.D.'s father. The court also ordered, on the basis of a stipulation by the parties, that (1) mother would have unsupervised visits, with CFS discretion to liberalize to overnights, weekends, or an extended visit in the mother's home; (2) N.D.'s father would have supervised visits, with CFS discretion to liberalize to unsupervised visits upon his completion of outpatient drug treatment; (3) if the children were placed with mother, then minors' counsel and their social workers would be allowed access to the home; and (4) the fathers were not to be in or around the home, and mother was not to supervise the fathers' visits.

In the September 24, 2020, status review report for the 12-month review hearing, CFS recommended return of the children to mother and termination of services for N.D.'s father. CFS reported that mother had made substantial progress and was aware of what would happen if she failed to comply with court orders. Mother had moved into appropriate housing to have the children with her. Mother reported understanding that N.D.'s father was not allowed at her residence once the children were returned.

Mother attended eight additional individual therapy sessions, 12 additional domestic violence classes, and 12 additional anger management classes. In September

4

2020, mother's therapist reported that mother told the therapist that she was no longer in a relationship with N.D.'s father and did not have any contact with him.

On the original hearing date of October 8, 2020, the court indicated that evidence (including videos) had emerged showing that, contrary to mother's statements, she continued to have contact with N.D.'s father, including at her home during a visit. The hearing was continued for minors' counsel's and N.D.'s father's contests.

In a November 2, 2020, addendum report for the contested hearing, CFS changed its recommendation to continued reunification services for both mother and N.D.'s father. The changed recommendation was based on evidence developed by minors' counsel indicating, among other things, that N.D.'s father was recently residing in Mother's home and that Mother was coaching M.B. not to disclose information about N.D.'s father because Mother "will get in trouble." Video recordings showed that N.D.'s father entered mother's residence on October 23, 2020, when mother and both children were present, and left the following morning for a brief period before returning with fast food.

Paternal great-grandmother reported to CFS that she believed that mother and N.D.'s father never split up. Mother continued to report that she was not in a relationship with N.D.'s father. CFS reported that mother appeared to "have benefitted from the parenting and counseling" but that her judgment appeared to be impaired as to N.D.'s father.

On November 3, 2020, the date originally set for the contested hearing, the recommendation changed again, this time to termination of services for both Mother and N.D.'s father, and the court continued the hearing for the parents' contest. Because the

5

continued hearing date would be after the statutory date for the 18-month review hearing, the court and the parties agreed that it would actually be a contested 18-month review hearing. The court discontinued mother's unsupervised visitation and allowed her once weekly supervised visits.

CFS subsequently filed a new status review report, recommending that services for mother and N.D.'s father be terminated and a hearing under section 366.26 be set for both children, with a plan of adoption for N.D. and legal guardianship for M.B. The recommendation was again based on video and other evidence of N.D.'s father's ongoing contacts with mother and presence at her home, as well as mother's continuing denials of those facts and her coaching of M.B. Mother was seen hitting and kicking N.D.'s father in one video from April 2020. In another video from October 2020, mother and father were at a party watching a basketball game. Mother claimed to have arrived at the gathering first and to have been "shocked" when N.D.'s father arrived. She said she stayed no longer than 15 minutes, which N.D.'s father corroborated. The social worker who viewed the video described mother as appearing "quite settled in next to [N.D.'s father], and very much in a celebratory mood." CFS reported that mother acknowledged that she had "made some mistakes" but "appear[ed] unable to grasp how her choices are contributing to the safety concern for her children." In light of the evidence showing that mother and N.D.'s father continued to see each other and that mother lied to CFS about it, CFS expressed concern that there was a "high potential" for domestic violence to recur in the children's presence.

N.D. was reported to be a "happy baby" who was thriving in "an environment with the stimulation he needs." He was bonded to paternal great-grandmother. During one of N.D.'s visits with his father, N.D. cried when paternal great-grandmother left the room. Mother visited with N.D. consistently, and no issues were reported.

CFS also provided a report containing additional information, which described facts showing that mother "continues to contradict her own statements, and continues to be deceptive." From mid-November 2020 through January 4, 2021, mother attended eight additional individual therapy sessions and completed another eight domestic violence classes. Mother did not tell the individual therapist the amount of contact she had with N.D.'s father, and she denied that M.B. had witnessed N.D.'s father attacking her. Mother denied that N.D.'s father spent the night at her house, even though his car was parked down the street overnight. She also claimed that she was not aware that he would be attending the gathering to watch the basketball game. Mother also attended 11 family therapy sessions with M.B. Mother told the family therapist that she saw N.D.'s father once for five minutes so that he could give her money for N.D. CFS reported that mother's admissions to the individual and family therapists who were seeing her during the same period were not consistent.

At the contested hearing on January 12, 2021, mother's counsel objected to admission of any evidence derived from minors' counsel's investigation of mother's home because she claimed that mother's address was confidential. The court overruled the objection, admitted CFS's reports, and granted a request for judicial notice of prior findings and orders. No party called any witnesses or introduced additional evidence.

The court expressed concern that after 18 months of services mother continued to be dishonest in general and to her individual therapist about the nature of her relationship with N.D.'s father. The court expressly found not credible mother's account of the recorded encounter with N.D.'s father in October 2020 in which she denied that he had spent the night. The court observed that mother and N.D.'s father had participated in services but did not appear to have made much progress—"we're in the same situation we found ourselves in a year-and-a-half ago with a significant alcohol issue on behalf of the father, and a mother who's unwilling to end that relationship or be honest about its status and [who] continue[s] to subject the children to that relationship." The court terminated reunification services for both parents and set a hearing under section 366.26 as to both children. Mother filed a writ petition under California Rules of Court, rule 8.452, which this court denied.

In March 2021, N.D.'s father's visits were switched from in-person to video conference because father was yelling at paternal great-grandmother and calling her names. N.D.'s father's visits were thereafter terminated altogether because he acted inappropriately on a video call with paternal great-grandmother and N.D.

In April 2021, CFS filed a section 366.26 report in which it recommended termination of mother's and N.D.'s father's parental rights. CFS believed that N.D. was appropriate for adoption and that it was in his best interest to stay with paternal great-grandmother, who wanted to adopt him. N.D. and paternal great-grandmother were mutually attached, and N.D. viewed her as a parental figure. N.D. was well-adjusted and listened to paternal great-grandmother. CFS observed that he "stay[ed] close to her" and

looked to her to have his needs met. Paternal great-grandmother described her relationship with N.D. as "being very close and nurturing."

CFS reported that paternal great-grandmother was retired, 68 years old, and had various health issues, such as diabetes, cholesterol, and thyroid issues that she was controlling with medication. CFS recommended that it was in N.D.'s best interest to remain with paternal great-grandmother.

CFS reported that mother visited with N.D. "very consistently" and acted appropriately during those visits.

One month later, mother filed a section 388 petition requesting six months of additional reunification services. Mother claimed that the changed order would be in N.D.'s best interest because "a child needs his/her mom. I am a great mother." Mother stated that she loved N.D. and that she had earned N.D.'s love and trust. N.D. would cry when leaving visits with mother. She claimed that N.D. was attached to her, even though he also was attached to paternal great-grandmother. Mother expressed concern about adoption by paternal great-grandmother because of her age and declining health, claiming that paternal great-grandmother was "becoming sick from her vision." Mother also worried that paternal great-grandmother would not allow mother to continue to see N.D.

In the petition, mother stated that she became involved with CFS "due to a bad relationship [she] was in," but she claimed that she had learned from her mistake. She submitted letters dated in May 2021 from a domestic violence education course and from an individual therapist she had started seeing the prior month. Mother was attending the domestic violence education course and had completed four out of 10 sessions. By

9

January 9, 2021, mother had attended eight family counseling sessions with her daughter. Mother told the family therapist that M.B. was not in the room when N.D.'s father abused mother. Mother also attached certificates showing that she completed an anger management course, a domestic violence course, and a parenting course over one year earlier in late 2019 and early 2020.

From April 2021 through mid-May 2021, mother attended six individual counseling sessions. The individual therapist reported that mother had explained how her family came to the attention of CFS as follows: "CFS placed her children with relatives due to an altercation that occurred between her former partner in front of their house. [Mother] reported that she had been out drinking with friends the day prior and that she fell and bruised her eye." When the police arrived following the altercation, mother told them her partner had not caused her eye injury. The law enforcement officers did not believe her and filed a report with CFS for domestic violence. Mother's individual therapist indicated that she believed that mother had "abided by the court's orders to keep her children away from their father."

The juvenile court denied mother's section 388 petition without holding a hearing. The court found that mother did not demonstrate a change of circumstances and that the requested change would not be in N.D.'s best interest. The court elaborated: "Petitioner's services were terminated after a full 18 months on 1/12/21 because she continued in a relationship with the father. Mom has participated in multiple rounds of thera[py] but has not demonstrated benefit over time. Enrolling in addition[al] services is a positive step but is insufficient to show a change in circumstances. Mom again

10

minimizes the domestic violence via the attachments. [N.D.] was removed at 1 mo[nth] old [and] deserves permanency [and] stability."

Mother testified at the contested section 366.26 hearing held the following week. N.D. lived with her for one month after he was born. After N.D. was removed, mother visited him as much as she possibly could. She said she was presently paying for N.D.'s haircuts and buying him clothes, shoes, toys, and anything requested by paternal great-grandmother. Mother described her visits with N.D. before reunification services were terminated. By the time of the hearing, she was visiting with N.D. once weekly for two hours. Mother said N.D. would cry at the end of their visits because he did not want to stay with paternal great-grandmother. He would tell mother, "'I stay with mommy, not Nana.'" N.D. was too young to understand why he could not stay with mother. Mother did not agree with CFS's recommendation because N.D. was little and needed his mom. Mother expressed concern about paternal great-grandmother caring for N.D. because of her age and problems she was experiencing with her eyesight.

Mother objected to the termination of parental rights on the basis of the parental bond exception. N.D.'s father's counsel joined mother's objection and argued that N.D.'s father believed that mother and N.D. shared "a very strong bond" and mother was a "very good mother."

The juvenile court found N.D. likely to be adopted, and the court terminated parental rights of mother and N.D.'s father.[1] As to the parental bond exception, the court

---

[1] The court also ordered legal guardianship for M.B. Mother is not challenging that order.

found that mother visited with N.D. frequently and that those visits were loving, but the court found that mother had not carried her burden of demonstrating that she occupied a parental role in N.D.'s life. The court also found that there was no evidence that N.D. would suffer detriment if mother's parental rights were terminated.

## DISCUSSION

A. *Section 388 Petition*

Mother argues that the juvenile court abused its discretion by summarily denying her section 388 petition. We are not persuaded.

"Section 388 permits the parent of a dependent child to petition the juvenile court for a hearing to modify an earlier order on the basis of changed circumstances or new evidence. (§ 388, subd. (a)(1).) The petitioning party bears the burden of showing that there is new evidence or changed circumstances and that the proposed modification would be in the best interests of the child." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120 (*N.F.*).)

"The change in circumstances supporting a section 388 petition must be material." (*N.F.*, *supra*, 68 Cal.App.5th at p. 120. ) "As to the best interests element, after the court has bypassed or terminated reunification services and set the matter for a section 366.26 hearing, the focus of the case shifts from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability. [Citations.] A court entertaining a section 388 petition at this stage in the proceedings 'must recognize this shift of focus in determining the ultimate question before it, that is,

12

the best interest of the child.'" (*N.F.*, at p. 121, quoting *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

A court may deny a section 388 petition without holding an evidentiary hearing if the petitioner fails to make a prima facie showing of either factor. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189; Cal. Rules of Court, rule 5.570(d)(1).) Conclusory allegations are not sufficient to make a prima facie showing. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593 (*Edward H.*).) "A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited." (*Ibid.*) In determining whether a prima facie showing has been made, "the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62 (*K.L.*).) We review for abuse of discretion the summary denial of a section 388 petition. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

To demonstrate that she made a prima facie showing of materially changed circumstances, mother argues that she reengaged in services "in order to learn the source of her mistakes in 2020" and to demonstrate to "the court that she had made the needed changes once and for all." She also argues that it was her "honest and sincere participation in the services and her conscious decision to cut [N.D.'s father] out of her life, which provided the prima facie evidence needed to warrant a hearing be set on the petition." The record does not support mother's arguments, and it amply supports the

13

juvenile court's determination that mother failed to make a prima facie showing of a material change in circumstances.

Before mother's services were terminated on January 12, 2021, mother completed the following services: 24 individual therapy sessions, 24 anger management classes, 12 hours of a domestic violence program and another 20 domestic violence classes, 12 parenting classes, and 11 family therapy sessions with M.B. Despite mother's participation in those services over the course of 18 months, the court found that mother had not made substantial progress toward addressing the underlying issues that led to removal because mother continued to have a relationship with N.D.'s father and to be dishonest about it.

After mother's services were terminated, she enrolled in another domestic violence education course and attended four of 10 classes. She also attended an additional six individual therapy sessions with a different therapist. Mother reported to the therapist that her children were removed because law enforcement was called after she had an "altercation" in front of her house with her former partner, which had not caused her to be injured. She claimed that law enforcement officers did not believe her claim that coincidentally she had accidentally fallen and suffered bruising the day before, so law enforcement filed a report with CFS for domestic violence. Mother also told the therapist that she had "abided by the court's orders to keep her children away from their father."

Given the extensive services in which mother participated for 18 months without making substantive progress, her participation in four additional domestic violence sessions and six additional individual counseling sessions, in which she continued to deny and minimize the domestic violence, did not constitute a prima facie showing of a material change in circumstances. Moreover, in light of mother's continued denial and minimization and also considering mother's dishonesty to previous therapists and to CFS about her contact with N.D.'s father despite video evidence to the contrary, the juvenile court acted well within its discretion by concluding that mother's unsubstantiated claim to her new therapist that she was not in contact with N.D.'s father also did not make a prima facie showing of materially changed circumstances. The court consequently did not abuse its discretion by concluding that the allegations in the petition did not warrant an evidentiary hearing.

Additionally, mother also failed to make a prima facie showing that additional services would be in N.D.'s best interest. On the face of the petition, mother alleged that additional reunifications services would be in N.D.'s best interest because "a child needs his/her mom. I am a great mother." These conclusory allegations about the general needs of all children and mother's assessment of her parenting skills are not sufficient to make a prima facie showing that it would promote N.D.'s best interests for mother to receive an additional six months of reunification services. (*Edward H.*, *supra*, 43 Cal.App.4th at p. 593; *K.L.*, *supra*, 248 Cal.App.4th at p. 62.)

15

At this stage in the proceedings—"on the eve of the section 366.26 permanency planning hearing—[N.D.'s] interest in stability was the court's foremost concern and outweighed any interest in reunification." (*Edward H.*, *supra*, 43 Cal.App.4th at p. 594.) After 18 months of services, mother continued to be dishonest to her therapist about the nature and extent of the domestic violence in her relationship with N.D.'s father. It would not have promoted N.D.'s stability and thus would not have promoted his best interest for mother to be provided an additional six months of reunification services to see if mother could and would be honest about that relationship so as to make meaningful progress toward providing N.D. with a safe home.

For all of these reasons, we conclude that the trial court did not abuse its discretion by denying mother's section 388 petition without holding an evidentiary hearing.

B. *Parental Bond Exception*

Mother argues that the juvenile court erred by terminating her parental rights, because the parental bond exception applied. We disagree.

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that adoption would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).) The exceptions allow "'the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, at p. 631, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

16

Under the parental bond exception, the parent bears the burden of proving three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would benefit the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636 [construing § 366.26, subd. (c)(1)(B)(i)].)

We review for substantial evidence the juvenile court's findings on whether the parent has regularly visited and whether a beneficial parental relationship exists. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship is reviewed for abuse of discretion. (*Id.* at p. 640.) But we review any factual findings underlying that decision for substantial evidence. (*Ibid.*)

In determining whether the parental bond exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); *Caden C.*, *supra*, 11 Cal.5th at p. 633.) When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, at p. 632.)

The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on another ground in *Caden C.*, *supra*, 11 Cal.5th at pp. 637, fn. 6., 638, fn. 7.) In determining whether severing the parental relationship would be detrimental, the court may consider issues ranging from "the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be." (*Caden C.*, at p. 640.) The court must also assess "how a prospective adoptive placement may offset and even counterbalance those harms," and in that regard the court may consider "findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told." (*Ibid.*)

The trial court found and it is undisputed that mother maintained regular visitation and contact with N.D., and the contacts were loving. We agree that these finding are supported by substantial evidence. Assuming for the sake of argument that N.D. would benefit from continuing his relationship with mother, we analyze whether N.D. shared such a "substantial, positive attachment" to mother that the harm in severing the parental

18

relationship would "outweigh[] 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 633.)

The juvenile court did not abuse its discretion by determining that any benefits derived from N.D.'s relationship with mother did not outweigh the benefit of stability through adoption. The record reflects that N.D. enjoyed visiting with mother and loved mother. According to mother, N.D. cried when it was time to say goodbye to mother and did not understand why he could not stay with her. That evidence shows that mother shared an emotional bond with N.D. and that he enjoyed visiting with mother. But "[a] parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*).) Contrary to mother's suggestion, there was no evidence that the relationship was so significant as to outweigh the security and stability of an adoptive home. (Cf. *Caden C.*, *supra*, 11 Cal.5th at pp. 633-634 ["When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent"]; *id.* at p. 635 [when a child has "'very strong ties'" with a parent and termination of parental rights "'is likely to be harmful to the child, courts should retain parental ties if desired by both the parents and the child'"].) Although N.D. enjoyed his visits with mother, there was substantial evidence that he was bonded to paternal great-grandmother, whom he considered a parental figure. The relationship mother enjoyed with N.D. during their visits is not

sufficient to demonstrate that mother and N.D. shared such a substantial, positive emotional attachment that terminating mother's parental rights would greatly harm N.D.

Mother also did not present any evidence that N.D. would be greatly harmed by severance of the parental relationship, or that the security and stability of a new home would not outweigh the loss of that relationship. Mother stated that N.D. would cry when his visits with mother ended and that he would tell her that he wanted to stay with her, but there was no evidence that N.D. would continue to cry after the visits or that he otherwise expressed any sadness about not being able to be with her. There also was not any evidence demonstrating that how N.D. felt when the visits ended otherwise affected his behavior or general emotional well-being. (Cf. *Caden C.*, *supra*, 11 Cal.5th at p. 633 [losing the parental relationship might result in "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression"].) On the contrary, the evidence demonstrates that N.D. was thriving and well-adjusted in his placement with paternal great-grandmother, with whom he had lived since he was one month old.[2]

---

[2]　Mother's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), *In re E.T.* (2018) 31 Cal.App.5th 68 (*E.T.*), and *In re Scott B.* (2010) 188 Cal.App.4th 452 (*Scott B.*) is misplaced. In *S.B.*, there was evidence (apart from the parent's testimony) in the form of a bonding study and a social worker's opinion that termination of parental rights would be detrimental. (*S.B.*, *supra*, at p. 295; see also *C.F.*, *supra*, 193 Cal.App.4th at pp. 558-559 [same appellate court observing that "*S.B.* is confined to its extraordinary facts"]; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2021) § 2.171[5][i][C], p. 2-694 [*S.B.* should be viewed as a "the result of a very unique factual situation"].) Similarly, in *Scott B.*, the social worker opined that terminating parental rights would cause detriment to the child, who was 11 years old and was removed when he was nine years old. (*Scott B.*, *supra*, at p. 471.) Finally, in *E.T.*, there was evidence that the

In challenging the juvenile court's decision not to apply the parental bond exception, mother argues that the court failed to take into account "all of the unique circumstances of the situation," including the purported unsuitability of paternal great-grandmother to be N.D.'s adoptive parent because of her age and alleged health issues. The argument lacks merit. The only health issue of paternal great-grandmother's that mother identified in her testimony and in her section 388 petition is that paternal great-grandmother was experiencing problems with her eyesight. CFS did not report that paternal great-grandmother was having any issues with her vision and otherwise reported that all of her medical conditions were controlled by medication. Moreover, CFS was aware of paternal great-grandmother's age and nevertheless recommended that it was in N.D.'s best interest to remain with paternal great-grandmother. It was well within the juvenile court's discretion to discredit mother's unsubstantiated allegations about paternal great-grandmother's health and to credit CFS's determination that it was in N.D.'s best interest to live with paternal great-grandmother given her age and known health issues.

For all of these reasons, we conclude that the juvenile court did not abuse its discretion by concluding that the benefit N.D. would receive from adoption was not outweighed by any detriment N.D. might suffer from the termination of mother's parental rights.

---

mother had gained significant insight through participation in services, and there was no evidence that she minimized or lied about the trauma that led to her children's removal. (*E.T.*, *supra*, at pp. 77-78.)

DISPOSITION

The May 14, 2021, order denying mother's section 388 petition is affirmed.  The

May 27, 2021, order terminating mother's parental rights to N.D. is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.


We concur:

McKINSTER
Acting P. J.

FIELDS
J.

22